First, I guess this morning and early this afternoon, the first is number 14-4764, Trinity Wall Street v. Walmart Stores Inc. Mr. Boutros and Mr. Friedlander, am I pronouncing your name semi-correctly? Correctly, your honor. All right, come on up. Thank you very much. May it please the court, I'm Theodore J. Boutros, Jr., representing Walmart. I'd like to reserve three minutes for rebuttal. That's fine, and this is one we may just ignore the red light a little bit, so go ahead. Thank you very much, your honor. This case raises important questions about the application of the SEC's rules governing when a company must... Let me ask a fact question at the outset. How many stores, roughly, percentage-wise, of Walmart sell firearms, and how many stores of Walmart roughly sell high-capacity firearms? Your honor, I believe that the high-capacity firearms are limited to probably a third of the stores, and there's about 3,000 stores in the United States, none outside the United States, so there's 26 countries where the company does business, and so it's a limited area. I believe firearms are sold, some form of firearms are sold in most stores. No handguns are sold in any stores by Walmart in the United States. No high-capacity magazines in terms of separate accessories, so it's a limited locations and limited natures of the sales, pursuant to very strict guidelines that the company has. And who set those guidelines? The company has a very rigorous process for deciding which products to sell and where, so this is something that's usually done at the ground level and in the management of the company. It's not a board decision generally. This goes, selling products goes to the heartland of ordinary business operations for the company, and so the store managers, from the store managers up, determining demand, determining what customers want, determining what makes the most sense for the company. There's also the board will make decisions and high-ranking officers about what makes sense from other perspectives, but again, including as a matter of policy for the company, but that goes still to ordinary business operations, which we believe falls. So, for example, as I understand it, Walmart doesn't sell adult movies, is that correct? That's correct, Your Honor. And it doesn't sell music that has parental advisory labels on it, is that correct? Correct, Your Honor. And who made that decision, the board or management? A combination, Your Honor, and the board will often make decisions that go to management, but the management input to the board, oftentimes it will be a management-only decision, and I don't think it's in the record who made those specific decisions, but Walmart has a very rigorous process in order to be a successful company, of having its managers on the ground in the stores all the way up to the home office about determining what makes the most sense to sell in which stores around the country and around the world. And that's why I go back to the ordinary business exclusion. Why is it improper for the board to set forth a policy to guide those management decisions about whether they should be mindful about whether a product is, quote, especially dangerous using language? It wouldn't be improper for the board to do that, Your Honor. In fact, the board does have, in our reply brief, we cite some of the standards the board committee, we call it the CNGC, has for determining issues about brand, issues about products, issues about what the company should be doing. So doesn't this proposal fall right within the type of duties of that committee already? Potentially. And if so, then this is outside an ordinary business matter, thus right for consideration by the shareholders, no? Not at all, Your Honor. Simply because it's an issue that the board considers. And the SEC in 1976 and in 1983 in the releases that we cite talked about this issue. Simply because something is considered by the board doesn't mean it's not an ordinary business operation. Doesn't this one transcend the ordinary business operation? We're talking about something that's a public debate in the fact that violence in communities is discussed by many, government officials, community leaders, people in the community, and public safety being such a concern. Isn't this one that transcends the ordinary business? It's not saying you can't sell a product. It's just saying consider when such products should be on the market. Well, on the latter point, the district court itself at page 819 of the appendix said that this proposal would and almost certainly could and almost certainly would affect which products the company sells. But as to your point, there's no question that the question of guns in America and gun safety and those issues are important issues. But that's not the question under section 14A8I7. Now, there are a couple elements to it. Here, this proposal goes far beyond just guns. It covers all nature of products. It covers products that might have an effect on the brand, on the reputation of the company, safety, family values, and community values. What if the proposal was only limited to item number one, especially dangerous products, and it didn't have the other two? Would your position be different? It would be the same because it goes to dictating or at least affecting the company's decision about which products to sell. And the SEC in over 150 no action letters has said that that falls within ordinary business operations. And it really is the essence of ordinary business operations. And Judge Schwartz, one point I want to make for sure today is that the fact that something doesn't go in the proxy materials of the company and is required to go in doesn't mean that the shareholders can't have a voice. They can either go to the annual meeting and make a proposal, there's a process for that, and make it on the floor of a shareholder's meeting. But is that practical? Will that really give information to all of the shareholders? The smaller shareholders aren't going to show up at these meetings. That's why the proxy process works the way it does, right? So is that really practical? It's one aspect, but it's one avenue. There's also just direct communication with the company. Trinity here reached out to Walmart, and Walmart welcomed it. And the VP of investor relations had a direct dialogue by phone and letter with the rector. And Walmart takes these issues seriously. So just because something doesn't go in the proxy materials doesn't mean that that's not an issue that the company's going to take seriously and look at and consider. But this really goes to the balance. This really isn't about gun sales. It's about the respective roles of shareholders, the board, and management, and how you balance this in the proxy process. How do you reconcile this circumstance with the cases that allowed proposals to go forward concerning whether napalm should be sold in the 70s, or whether a tobacco company should stop selling tobacco products, or a company should not create a nuclear facility? I mean, those are all potentially ordinary business decisions of those respective companies, but each of them arose in the context of a social context at the time where maybe there were heightened sensibilities about those various subjects. How is this different? It's different in at least two respects. First, the SEC, this is a line drawing exercise, which is one reason I think a strong dose of deference goes to the SEC and its guidance, because it's a nuanced, factual line drawing that goes on every year with a task force. It's a very complicated issue, but those issues where it's a manufacturer, the SEC has drawn a line because it's so much more closely connected to the company. If there's a social issue about napalm, and saying to a manufacturer of napalm, do not do this, do not produce this anymore, the nexus is so close, and it has such a significant effect and integral relationship to that company, it falls outside ordinary business operations. It's a big issue. When you're talking about Walmart that sells hundreds of thousands of products around the world, pointing towards whether or not to sell one particular product does not rise to that significant policy issue that the SEC has pointed to. And here, the other problem with the proposal is in the cases that have decided this issue, really, as you probably have noticed, there aren't that many circuit court decisions, but all three that I've been able to discern support our position here on this significant policy issue. Then Judge Ginsburg, now Justice Ginsburg, in the Roosevelt v. DuPont case, this really goes to your point, Trinity cites this case, the question was whether DuPont should continue to manufacture chlorofluorocarbons, CFCs, which everybody agreed was having a depleting effect on the ozone layer, and so it definitely implicated, brought in an important public policy issue, and Judge Ginsburg at the time said, the President's talking about this, Congress is talking about this, it's gotten headline-grabbing attention. So it was a big issue of the time, but the court said there in the Roosevelt case, we need to home in on the proposal itself, and is it asking for something so significant for the company and so such a big, major matter that it meets the exception. Wasn't the problem there that the proposal was very detailed, specific, it talked about issues of timing, where this one is a much more broad-brushed, sort of come up with a plan to consider whether you should sell these products, as opposed to what happened in Roosevelt, which was really wanted some timing and deadlines, and maybe that was what the problem was for that proposal. That was one, that was the key issue, that was an implementation, wanting to speed it up, you're absolutely right, but I don't think that distinguishes it from here, because here it's going to the products beyond, let's just assume that there's a significant social and political issue concerning guns, and there is. But the question is, it's such a significant issue as it relates to Walmart and its business operations, that it's an extraordinary thing that takes, I think if the court goes down this road, what about music lyrics, books, content in creative material, organic vegetables, non-organic vegetables, there are all kinds of issues that are, sugary sodas, all sorts of issues concerning health and other things that can be controversial, that are grabbing headlines, that implicate products. And going back to your question about manufacturers, that's really where the SEC has drawn the line, and I think the court should defer to that determination. Otherwise, it opens up this whole area, and the proposals that would come in start to clutter up, and make it so the shareholders don't really know which is really an important proposal. Your view is if this exact proposal was given to a company that manufactures the high-capacity magazines, then this proposal would be okay. But if it goes down the chain of distribution and goes to the seller, it interferes with ordinary business decisions, even though it's one of many products the company sells today. Based on the SEC's guidance on this, the Sturm and Ruger no-action letter from 2001 said basically that the gun manufacturer proposal regarding gun safety was not excludable. No-action letter was not granted. But in a matter regarding Wal-Mart the same year, 2001, which was a stop-selling-guns proposal, a no-action letter was granted. Because with hundreds of thousands of products, and maybe even more, it's too diffuse. It's not the sort of major significant issue that really goes to the core. One of the examples the SEC has given in one of its releases, which are entitled to controlling weight, is a construction of a nuclear power plant by an energy company. That's a big issue. It raises all these issues. And it's a big issue for the company because that's at the core of what the company does. Wal-Mart sells many, many, many more products than simply guns. And I want to make clear, again, it's something the company does look at very carefully. If it's not in their proxy, that doesn't mean the company is not going to take it seriously. But it really goes to this broader question of striking the balance between shareholder suffrage. Thank you. Shareholder suffrage, I love hearing that. Shareholder suffrage, the balance between making sure shareholders can be heard with the prerogatives of management. And when it goes into this area, I can't tell you, having done a lot of work for Wal-Mart over the years, how much picking out the products to sell and what not to sell and where to sell them is the essence of the ordinary business operations of the company. And so that's what, when you look at this proposal, that's what it goes to. The district court noted that it would affect and could affect the products that would be sold. The SEC found that. And given that, it falls squarely in that ordinary business operations exception. You mentioned that what the SEC does on the staff level with regard to no-action letters is a line-drawing exercise. And I'm not quite sure in looking at these myriad letters where the line gets drawn. When you look to Kroger and Denny's, one being whether you have certain type of eggs from cage-free birds or also Kroger products sold under brand names or private labels that they should be removed from genetically engineered crops. Those were cases where no-action letters were denied. Where is the line for the SEC staff? And I realize that it doesn't bind the SEC. That's clear. It reminds me to some extent of not precedential opinions of our court. It doesn't bind the full court. But there's still got to be a rhyme or reason to it. And I think there is a rhyme or reason to it. There are some close cases. And the Denny's case jumped out to me when I was going through all these no-action letters. It's probably closest to the line because it's not an egg producer, but it's someone who is using eggs in their business. But if one looks over the history, it's been very consistent. The American Petroleum Institute Business Roundtable Chamber of Commerce brief goes through the fact that there's been probably 150 no-action letters where the question has been which products or services a company should provide for various reasons, including things that go to political or other social controversies and the like. And the no-action letters over and over again have said those are excludable. Now you're the judge. Where do you draw the line? I would draw the line if when we're talking about a retailer, if the proposal would or could affect the products that the company would sell, that falls squarely in the heartland of the ordinary business exclusion. That's exactly what we have here. The fact that there's a proposal, excuse me, that the proposal has the board engaged in something and making policies or is somehow involved is not determinative. And that's where the district court really, I think, got it incorrect. The district court did not cite the 1976 and 1983 releases of the SEC, which they are subject to the highest level of deference. This court's decision in the Morrison case, which I believe relied on the Auer case from the Supreme Court. Wait a minute. There you're talking about sort of a brand X. If a court decides an issue and a year or two later the agency that has to deal with that statute on a regular basis goes the other way, courts should defer unless, especially if there's any ambiguity in the statute. Our court expanded that to regulation. But this is not a regulation here. This is by the SEC's own statements something done on a quick basis by staff without real input from the, other than some guidelines that have been adopted in 76, 83, 97, et cetera. The commission itself doesn't really get involved in this, does it? In the releases that I spoke of, those are official commission positions that I think fall within the 1976, 83. It's like written by the Delphic Oracle. No, I think those are the process of the SEC and the commission itself taking a position through a formal articulation of their policies. I grant you the no action letters, we have not argued that they're entitled to the sort of significant deference, but as you pointed out, they're more of the persuasive variety. But they are a process. We have a declaration in the record from a former head of the Corporation Finance Division that talks about the three-stage review, the task force during the proxy season. There's a meeting in the summer where investors and companies come in and meet with the SEC to talk about the process. So it's a very intimate, nuanced, fact-bound process that's guided by these policy statements that are entitled to deference. So let's go back to the line drawing. So you're saying that any time there is a product to be sold, it's ordinary business, and you would distinguish Denny's as they're selling a product, eggs, and Kroger's is selling a product which may be genetically altered, what's the difference? Well, in the Denny's circumstance, it's a much narrower band, a much more important component to what they do, just to compare with Walmart, as to a company that's selling hundreds of thousands of products, and the policy issue that it's pointing to implicates one of those products. The Kroger case is, I think, a closer call. Again, I guess I would say because it's this line drawing process, the court should defer. And I know I'm not saying to all the no-action letters, but there are going to be some outliers for sure. This case is not an outlier. This goes right to the products the company would sell, and it's not limited to the high-capacity equipped magazine guns. It's not limited, nor does it direct whether the product should be sold, unlike some of the other proposals which are much more affirmative in the request, that is, stop selling X. This one simply says consider policies concerning the sale of X. Isn't that different? I think it was an attempt to get around the pretty clear line of no-action letters and guidance that something telling a company not to sell particular products would be excludable. But I don't think it changes the equation. Because of the 1976 and 1983 releases, and we cite the SEC legal staff bulletin from 2009, it says you have to look to the underlying subject matter. Well, the staff bulletins are on no different footing than the no-action letters, correct? I agree with you, yes. And if I could ask you just about the releases. From your experience, do the releases, do the most recent ones have more persuasive value or entitle to more deference than older ones? I don't think so, Your Honor. For this Court's decisions, I think they're all predicated on their reasoning. They build upon each other. The 1998 release I think is perfectly consistent, and if anything, tightens up the significant policy exception because it talks about focusing on a significant policy issue. The decisions I mentioned, the Roosevelt decision from the D.C. Circuit, there's the Grimes decision, there are two Grimes decisions. One is cited by the parties, the D.C. Circuit, where it was a proposal about capital expenditures, significant capital expenditures. Both the Second Circuit and the D.C. Circuit said, well, that might be significant. It might be a significant policy issue, except your proposal goes beyond that significant policy issue. That's what we have here. The fact that guns is one example doesn't suddenly trigger this policy exception because there are other ordinary business operations that are encompassed, and the Apache decision we cite makes that point. I'm sorry, Your Honor. Go ahead. I was going to say, even if we assume that they've gotten in the door, once the well is tainted by the fact that ordinary business operations are swept in by the proposal, and here, product sales of different types, that means it's possible. But there's not a release from the SEC that draws a line between manufacturer and retailer for purposes of whether matter involving the significant social policy issue would be excludable or not. That's correct, Your Honor. They have not squarely authoritatively made that point. I think it flows from the analysis that we look at what is crucial, major to the company. I think major is one of the words used in the 1976 release. And the examples that are given, if we look at the 1998 release, it was a reaction to the Cracker Barrel proceedings, which had said that employment discrimination was not a significant policy issue in that context, and they changed their position on that. And the examples they gave, though, were very significant to the company, big issues that would have a significant effect on that company, plus captured some social policy issue. We don't have that here because we're talking about a company that sells hundreds of thousands of products, and the proposal goes beyond the arguable significant policy issue that otherwise might be implicated. What would be, to follow up on Judge Bonaski's question, what would be a proposal that you would say should be included in the materials for the annual meeting? What type of proposal would pass muster? I have a couple of examples because Walmart does include proposals. Last year it included proposals about the requirement or the request that the chairman of the board be an independent chairman, that recruitment of executive pay based on various factors be disclosed, requests for annual report on lobbying. Something that comes closer, the SEC denied a no action letter in 2011 to Walmart, where it was a proposal asking that Walmart seek its suppliers to report to Walmart on their sustainability efforts. What if there were a specific proposal that Walmart not sell firearms with high capacity magazines? That, Your Honor, we believe would be excludable under the plain language of the ordinary business operations exclusion, and again, it's been over and over again with the no action letters. In 2001 that was essentially, it was a broader proposal with all guns, but we believe that would be excludable. What you just said seems to be in some tension with what you noted on page 32 of your opening brief, where you say that there are some proposals that perhaps if they're specific enough, and I thought you were talking about firearms at the bottom of page 32, that seemingly would be acceptable and not subject to a no action letter. I think, Your Honor. You might want to take a look at that before we get you back on the floor. I will do, Your Honor, absolutely. All right, let's hear from Mr. Brady. Thank you very much. Thank you. Thank you. May it please the Court, Joel Friedlander for Appley Trinity Wall Street. We read in the briefs that the decision below undermines 40 years of SEC guidance. I'd like to provide three reasons why that's not the case. One, Chief Judge Stark followed the most authoritative guidance in the SEC, which is the most recent SEC release in 1998 and the Staff Legal Bulletin in 2009. Second. But in effect, I mean, he went one way and then the other, so it's obviously a close call. He went one way last April and then November went another way, your way. And I'm trying to figure out what is the best way for a court to analyze it. I mean, for example, maybe there could be a couple of questions. One, what is the subject matter of the review that it calls for by the staff? And then once you determine the subject matter, does it involve the company's ordinary business operations? I mean, is that a good way to analyze this? I'm trying to get the same questions for you as I had for Mr. Petros. Where is the best place to draw a line between what is excludable and what is not? Sure. I think the best place and the most authoritative place is the place Chief Judge Stark looked to, which is the 1998 release. There is an elaboration of the considerations that apply. What is said in the 1998 release? The key language in the 1998 release, which is to get the question, what is an ordinary business problem? They said two considerations. On the one hand, we have tasks that are so fundamental to management's ability to run a company on a day-to-day business that a shareholder vote would be inappropriate. And on the other hand, we have proposals that transcend the day-to-day business matters and raise policy issues so significant that a shareholder vote would be inappropriate. But the SEC seems to be fairly consistent. For example, cigarettes, you get a no-action letter. Firearms here, you get a no-action letter. So the staff has been fairly consistent, and that's the way they've been interpreting, I guess now for 17 years, that 1998 release. Well, the important thing about the staff, I think it's just what SEC Chair Mary Jo White said in a speech last month. The staff strives to be consistent. They try to be consistent. They try to be correct. But these are informal responses. They're not precedent. That's usually good for job security. It makes sense. But they're not precedent. They're not binding on a court or the commission. And more importantly, or as importantly, the views and interpretations may evolve over time, and that changes may be reflected in guidance, interpretation, or rule changes as necessary as they see the run of proposals over a period of years. But at any one individual point, the staff is going to be guided by what they did last year or the year before. But that's very different than the court stepping in and saying, here on this proposal before us, let's look to our authoritative source, which is the 1998 release. If your proposal is not excluded and actually is adopted, what would you anticipate the board doing? What we'd anticipate is the board exercising oversight over this area, just as a board exercises oversight over other areas. You don't think it does so already? We don't know the extent to which it does or to what extent things rise to the board level, going back to the questioning at the beginning of the argument. It's clear Walmart has policies in different directions. Some might be store to store. Some might be company-wide. But it's unclear to what extent they're published or if they were ever reviewed by the board or adopted by the board or how they're formulated. For instance, there are published policies about parental advisories on lyrics for music. But when we hear about the gun policy, it's just in a letter to us. I think it's page 255 of the record of the appendix. It's just they say, here are our policies. But we don't know how those policies were adopted or whether they made it to the board level. The board exercising oversight would be just being sure that as part of this committee's job, it's getting input at its periodic meetings about, here's how that process of policy formulation and review is being undertaken in this area. So your proposal, or Trini's proposal, is different than these other proposals that are product-driven because you're not requesting a vote to cause the company to stop selling a product. You're just asking that the board adopt some sort of standards when deciding whether these, quote, especially dangerous products are focusing on your element number one. Exactly. And that fits under the 2009 guidance where the SEC recognized the importance of board assessment and evaluation of risk and the board's duties in relation to risk assessment and that sometimes the board's roles in relation to certain kinds of risks can raise issues that transcend the day-to-day business of the company. Here we're saying, as Chief Judge Stark ruled, the sale of weapons with high-capacity magazines creates reputational risk because retailers have brands, they are associated in the public mind with certain things, and Walmart found itself at the center of a national public debate over guns, and it creates event risk, like what if, God forbid, it's a Walmart gun, if there's a next mass killing and it's tied to a Walmart sold gun, even when it's not a gun bought at Walmart but it's just a model of a gun that's marketed by Walmart, Walmart is thrust into the public eye. It's invited by the president to a summit. It's the subject of a lot of press inquiry because Walmart has chosen up until now to be the low-cost provider of the AR-15 rifle when many of its competitors don't. So that goes to the reputation of the company in the public mind. Following up on what Judge Vannaschi was asking, though, is sort of what do you expect the board to do? Would the way this proposal is drafted, since it's not limited to firearms, it says especially dangerous products, require Walmart to then evaluate every product it sells, and therefore, if so, wouldn't that be tantamount to micromanagement and be improper for shareholder voice? Well, I think it's important to recognize that there's no argument about micromanagement at all. That's a concession by Walmart. Going back to Judge Ambrose's question about the considerations in the 1998 release, one was that day-to-day business, the second was micromanagement. Here it's conceded there's no issue with micromanagement because we're not asking the board or management to survey every single item that is sold and to classify it one way or the other. Walmart has tools at its disposal to see, well, what kind of products, if any, are generating controversy? What's our interaction with, say, law enforcement or with vendors or with advocacy groups? Or what's our monitoring of the media or social media? What complaints are we getting from customers? So they have means of addressing, of filtering, you know, to say, well, what products really matter? And over the history of the company, periodically, there are debates over really prominent cultural, socio-political debates over certain items, which Walmart finds itself at the center of, and that leads to the evolution of policy. Say, the parental advisory labels on music would be a great example. But there are others over the years where Walmart, because of its prominence, gets thrust into the public view and has to make a decision. And what we're saying is this is the kind of thing, because this happens to Walmart, because Walmart's so prominent, because it's the nation's largest retailer of guns in this instance, that it's important that certain types of products that fit within these categories have the right level of board oversight and not be just something done on a management level that we don't know, and more importantly, that the stockholders have input. So in the list of circuit court cases, the circuit court case that was missed on the subject is the most important one, which involved Dow's sale of napalm during the middle of the Vietnam War to the military. Very strong language from the D.C. circuit in 1970, which led to the 1976 release, which actually liberalized the standards as particular to social proposals, the SEC to say we've been excluding too many important proposals in the past. We have to be more flexible in the future. So it's ironic when we talk about 40 years of guidance. The 1976 release liberalized the interpretation of ordinary business to allow more proposals. Similarly, the 1998 release overturned the staff to say certain kinds of employment-related matters should not be automatically excluded. There shouldn't be a bright-line rule saying if it relates to employment, it's excludable. Similarly, there shouldn't be a bright-line rule for retailers that there's an automatic, if it somehow involves the sale of a product, it's automatically excluded. Let's go back to the beginning. If we were to analyze this under a rubric of what is the subject matter and then determining whether that subject matter is one of ordinary business, is the subject matter here the merchandising decisions made by Walmart of the products it sells in certain of its stores? By the way, I think the number is about half of its stores. I think they're about half of the 4,000 stores that we referenced so far. I thought he said 3,000, but you said 4,000. No, on the record, I was saying there's been loose references in the press and that's about 4,000. So somebody makes, okay, but is the subject matter the merchandising decisions as to which products to sell in which stores? It's for board review about whether to sell products that pose a special danger to the public or to the company's brand, speaking colloquially. I mean, we have more words than that to the proposal, but that's the essence of it. But if it's a merchandising decision, I mean, let's say you're a board member, and someone comes in and they say, okay, things are going on. People are upset about the Bushmaster rifle, and we're not going to sell that in 100% of the stores. We've made a decision, management, that we will sell it in certain stores where it's acceptable to do so because there are different types of values that we perceive in different communities. Is a board member really going to interfere with that? The only thing I could see a board member saying is maybe we shouldn't sell it at all, but when you get down to which stores you do sell it, it would be micromanaging for me, that you can sell it in rural Ohio, but you can't sell it in New York City. Well, that's why we're dealing with this at the level of board oversight period, and then the board can decide the substance of what that policy guidance will be. Is this a product that we don't sell at all, or is this a product we sell in only certain locations, taking into account all the cost and benefits associated with that? Do we know if there's been any board involvement with regards to the decision to sell high-capacity firearms? No, we don't. I mean, I think the only reference to gun policies we see in letters, we don't see them, say, published on the website, I don't believe. And, indeed, in the aftermath of the Sandy Hook Elementary School, it was pulled off. There was changes. It was pulled off the website, and then it was put back on the website. And then it was, well, did we accept the invitation from the president, or did we decline the invitation from the president? I think these things are in flux, which just goes to show the importance of some board-level consideration, because this is something you see in businesses all the time, is some managers, for good reasons, might want to sell a product saying, hey, we can sell a lot of this product, regardless of what it is. And the board can say, well, let's look at the company's reputation as a whole. Let's think of how this affects the company in total. There's a challenge to this also on the vagueness point, which I understand from the district court's record that was raised only at summary judgment time. But if we look at your proposal, we've been spending a lot of time talking about engaging public safety, number one. Yes. We're looking at items two and three. Yes. Two and three talks about potential impact on the company's reputation, and number three talks about that would reasonably be considered by many offensive to the family and community values integral to the company's promotion of its brand. How would one know how to define many and offensive? Well, I think there's a – And family values. Sure. For the purposes of this, because it looked like number three was the one that was getting the most scrutiny from your adversaries on the vagueness argument. Okay. Well, we're going to focus on three. I think all the words to it are important because they're all qualifiers in an important way. So in the sense that the company promotes its brand, it has a brand. The company has certain values which it pronounces and says, these are our values, including family, community, and others, which they talk about in some level of generality, but then specifics and initiatives along those lines. And then reasonably considered by many are all, to be offensive to that, is, well, is there some segment of the population of the customer base or the potential customer base, because Walmart wants to move into new areas geographically or emphasize certain things, that this is antagonizing a significant part of the customer base or the potential customer base. So I think all of those qualifiers show that we're talking about a very limited type of class of products where Walmart can assess through market research, through customer complaints, through press, through advocacy pressure, through whatever different means it has of gathering information and market research. For instance, if they were to say, you know, I'll bet we can sell a lot of music with the parental advisory labels. Thank you. There's probably a lot that we could sell, but doing that, if we made that decision, would this create a backlash and create a problem? What hypothetically, if the court thought that Judge Stark was correct, but thought item number three was too vague, what would your position be if that were omitted? Does that gut your proposal? Does it have a material impact on your proposal? Does it change anything? Because it appears from the scheme that one could want a piece to be removed. What would that do to your proposal? Well, the proposal, our proposal is written and or. So we think the guns of the high-capacity magazines fits in all three categories. But what this category does is actually it's creating lots of different limits. We're talking about it's not a subjective test. It has to be reasonably considered by many. So it's like a significant portion of the potential customer base. It's linked to the company's promotion of its own brand. The board is the custodian of its brand. It knows from its own market research and public relations efforts how successful it is in promoting its brand, what it associates with its brand, and, therefore, whether something runs counter to it, whether it's getting some level of resistance and creating problems in how it's branding itself. I think a great example is the Rite Aid no-action letter, which was supplied to the court recently. CVS, this falls with CVS, decided to brand itself as CVS Health. But that involves cigarettes, right? Exactly, yes. But essentially that was what you have in your proposal in terms of the way it's worded. Isn't that correct? It's almost identical, isn't it? It seems that the Rite Aid proposal was tracking the language of our proposal. But just to draw the link, you could say there's an issue about health and well-being and public well-being, but, secondly, how the company wants to associate its brand. So at some point you say, well, for CVS it was $2 billion in annual sales, but we'll put those aside because it's so important how we brand ourselves. Walmart knows the importance of its own brand. It can assess this. The board can assess this with all the input it gets from different types of management in terms of sales, pluses, minuses, and how successful they are and where they want to be and how they're positioning themselves. So it's a way to give that flexibility to the board in terms of its own brand, its own evaluation of the customer base. Can you point me to any denial of no-action relief where the underlying shareholder proposal sought to influence, even indirectly, whether a company can continue to sell a product for which there is consumer demand? Well, I think that there are these string of no-action letters about the do-not-sell. I think maybe something that would be related to that would be for the retailers, I think the Nordstrom 2000, about looking at the sourcing of the working conditions from where it gets its products. You know, to say you have to look into the working conditions and the labor conditions of where you're getting your products or say labeling the genetically modified food. There are things, there are no-action letters associated with products that get sold. It almost seems as if when you look at Kroger and Denner's, Denny's only what somebody is attacking is the source of the merchandise that you get that ultimately you sell. Obviously, no one is saying don't sell eggs at Denny's. Just don't sell eggs that come from a particular type of source. And Kroger, it seems that you can sell these products, but don't sell them if the source, don't put them on your shelves, if the source is that these products are genetically modified. I think it was identify and label if they are as opposed to do-not-sell. You're right. And Denny's, Denny's tried to market it and say we're just a vendor, we're not a manufacturer. But to the extent that staff is drawing a distinction and doing it consistently, because that's what you expect bureaucracies to do, to try to be consistent, and use applied rules of thumb, they're subject to being revisited. Like, does this really make sense? Just like in 1998, there was a reversal of the cracker barrel, no-action letter, saying if it's employment related, we're excluding it. And they're saying, well, no, no, some things transcend day-to-day business. There is no retailer exemption in the ordinary business exclusion. There is no product sale exclusion. Anything related to the sale of products is automatically excluded. It has to be the analysis of the 1998 release. Does this micromanage? Does this transcend day-to-day business? Does it involve important, significant policies, such that it's appropriate for shareholder input to be weighed, which goes back to the 1970 decision about the sale of napalm during Vietnam and saying this is something the stockholders can weigh in on. When the decision was made to submit this particular type of proposal, which in the explanation of it talks about firearms, why was there not a specific proposal to deal with high-capacity firearms, as opposed to a generalized proposal that talks about a corporate governance committee that deals with influences on brand, et cetera? Because we think that this is something the board should be doing overall. It should be looking at, as a way of classifying important types of categories of products, that this is something the board should be exercising oversight over, not just necessarily a one-off, but that guns are an example of an issue that has recurred periodically as to certain products over time at Walmart and will arise again, and that this is an area of appropriate focus of this board committee. It's an area of appropriate board oversight. So if there are other products that fall within these categories, they should be the subject of policy review and assessment by the board, oversight by the board of a managerial process of looking at this question of reputational risk. One concern with respect to the third disjunctive consideration here, following up on Judge Schwartz's question, would reasonably be considered by many offensive to the family and community values as integral to the company's promotion of its brand. I mean, that could cover so many different products as well beyond high-capacity firearms. Is the board expected to evaluate all of its products against that factor? What about contraceptives? Well, if you take the example of contraceptives, the morning-after pill, for example, was a subject of great debate at Walmart from 1999 to 2006. They didn't sell it even though their competitors did, and then they changed their mind in 2006. And we're saying this is an area of board oversight. I don't know if that was a board decision or not. Yeah, I was going to ask. Yeah, but to the extent, and again, Walmart finds itself in the crosshairs of the press because of its size, because of its prominence in the debate, that these issues do recur, whether it's the music and the labeling controversies in the 80s and early 90s about video games or music or contraceptives or guns with high-capacity magazines. It is a recurring issue at Walmart. And as to a certain, I think it's a pretty narrow class. We're trying to circumscribe it with all the qualifiers in the language. By many offensive, I go back to Judge Schwartz's question. I'm not sure what would be considered by many. I don't know what many means. Well, I think it should be interpreted in the scale of Walmart to its customers. Is it something that could affect, that endangers the brand? Does it endanger its reach to a significant population base or potential customer base of the company? Does it matter that Walmart is so large as compared to other companies? And I guess put differently, would this proposal not be made or be less successful if the company was smaller? I mean, should the size of the company matter? I mean, if your position is this has to do with giving shareholders a voice on issues that shareholders think is important, does it matter that Walmart is big or small? I think it matters in this sense. If we talk about the guns with high-capacity magazines, Walmart was invited to the presidential summit. I don't know how many other retailers were or companies were. So from your point of view, the climate is such that an entity like Walmart should, as a good corporate citizen, consider these sorts of factors. It should consider them because it finds itself in the public eye. So Walmart gets thrust into national debates that maybe it would prefer not to be involved in, but it finds itself in. And by virtue of having to take a position, it can affect its reputation in a significant way, and therefore for this, I would say, particularly narrow class of products, it's an appropriate subject of board oversight for Walmart. I'm not going to say it necessarily applies to another hundred retailers around the country, but for Walmart, Walmart finds itself facing reputational risk in this area. What kind of deference would you suggest courts give to SEC staff no-action letters? I think the Second Circuit put it well, and I think it was the Shire Farms Group case. They said, SEC no-action letters, dot, dot, dot, are entitled to no deference beyond whatever persuasive value they may have. That was the Second Circuit in 2010. Sounds like Skidmore deference. I think it is a form of Skidmore deference, and you look at the factors, and one of the factors is the ultimate persuasiveness of the arguments, the formality with which it's promulgated. I'd be reluctant to say an SEC no-action letter is on the same footing as a legal bulletin. I think there's some care and some revision of prior staff actions when it comes to the formality of enunciating a legal bulletin, such as in 2009, that just is not found in these one-line or two-line decisions or in no-action letters. So I think under Skidmore deference, I think this would be a very low quality. Certainly, it's not like an amicus brief. The SEC has not stepped in to write an amicus brief, and it's not an SEC release. I think we've heard all of them referred to as guidance, but I think the level of deference for SEC, I don't think there's any real deference. It's just if it's persuasive. Here, the SEC no-action letter did not recognize the novelty of proposal. It didn't recognize anything about the 2009 legal bulletin and the importance of board assessment of risk. It didn't talk about how it was alike or different from prior SEC no-action letters that are just do-not-sell proposals. So for all those reasons, I don't think there can be any deference or really any persuasiveness attached to the no-action letter in this particular case. My final question is your opponents and a number of the amicus briefs have suggested that the consequences of a decision that affirms what Chief Judge Stark did here are that you will have myriad proposals that will have to be included that will cause a significant drain of time, energy, money, et cetera. What is your response to that? This is an ongoing process. There are lots of proposals every year. There are hundreds of proposals every year. The real controversy on the ordinary business exclusion started in 1975 and led to the 1976 release. The American Jewish Congress put out 150 proposals to 150 different companies by the Arab boycott of Israel, and the SEC had been excluding them, a lot of them, and the SEC revisited that and said we're not going to have a straight economic test about whether they can be automatically excluded. The SEC works through these things and has issued most recently the 1998 release about how on a case-by-case basis these proposals get adjudicated, and so it depends on the particular company and the particular proposal.  I apologize. Just to sum up, the line drawing that you would do were you writing this opinion would be what? Between what is excludable and what is not? I think the important thing is is this a day-to-day business matter or does it raise a significant policy issue? Does it involve board assessment of risk as to a subject matter, which creates a reputational risk for the company? I can't put it better than Chief Judge Stark. We talked about the social and community effects of the sale of high-capacity firearms, the impact this could have on Walmart's reputation, the reputational risk, the event risk associated with this particular subject. All right. Thank you very much. Thank you, Your Honor. I'd like to start with the second-to-the-last point Counsel made. He did not disclaim the notion that this could Just hang on for a second. We'll make this five minutes and then we'll be done. Thank you very much. That endorsing this approach here will create an outpouring of similar types of proposals. We already saw the Rite Aid proposal, which was very much tracked, almost identical except on tobacco. And this is a real problem. You saw the brief from the Society of Corporate Secretaries. It's a real practical problem. And let me put in a plug for my friends at the SEC. They work hard to go through these letters. They're doing the line drawing. They work with the investor community and the corporate community. And these are hard lines to draw. And so I think everything that Counsel said, to me, counsels towards deference to the SEC releases but also to the process. And Counsel said that this was a recurring issue for Walmart, these sorts of issues come up. That means it's an ordinary business operation. It's part of what Walmart grapples with as a business, the products that it sells, issues that are raised regarding those products. But that means it's excludable. The other point I wanted to make, Your Honor, you asked me about the page 32 of our brief, and there we were focusing on the focus language, that because that third, in particular that third disjunctive goes so far beyond gun sales or anything like that or even dangerous products, that it does not, the proposal does not focus on a significant policy issue and therefore it can't be, the exception doesn't apply to the exclusion. Well, isn't it a significant policy issue when you have something that affects brand and reputation? No, Your Honor, the SEC in the no action letters have repeatedly held that brand and reputation, and I think in our reply brief and our opening brief, that those are not significant policy issues. Those are ordinary business issues. What about public safety and well-being? Same thing. There's been no public safety carve-out with respect to retailers, and I think the fact that What about things that are perceived that in the community would harm significantly the reputation of the seller? With respect to retailers, again, I don't think that should be the test. That is an ordinary business decision. A company determining what's good for my reputation, how are customers going to respond to me so I can be profitable and also a good corporate citizen, that's what companies do. So then what is not excludable? I gave the example of where the sustainability issue on suppliers, and I think, Your Honor, Judge Ambrose, you put your finger on one distinction here where it's not a direct intrusion about which merchandising decisions, which counsel admitted this would go right to regarding certain products. You said sustainability of suppliers. What does that mean? Well, the proposal that was denied no action relief was one from shareholders asking that Wal-Mart require its suppliers to make a report on sustainability and environmental, any sound practices and the like, and SEC denied no action relief there. Although that was, the example you gave would seem to be significantly less concerning to me or I, a board member, than the reputation of the company that I am on, whose board I am on. There's no question, Your Honor, that the reputation of the company and it's the views of consumers and the public of the company is an important issue. But that doesn't mean that any proposal that comes forward and says the board should consider whether certain sales or products will have an effect on the reputation of the company. That's an ordinary core business issue. And the significant policy issue hasn't gone nearly as amorphous and broad as counsel suggests. It's not whether it's an important issue for the board to consider. It's discrete. And I think, Judge Schwartz, you were pointing to some issue of social significance, plus is it such an integral, closely connected issue to the company, and this goes to the manufacturer-retailer distinction, that it's an epic issue for the company that transcends day-to-day business. As counsel noted, merchandising decisions, that's day-to-day business. Do issues and controversies come up with a big retailer? Yes. That's what the managers on the ground and the officers and the people running the company confront every day. That is ordinary business. And with respect to what is not ordinary business? Things like executive compensation, independent board chair, the kind of things that Walmart includes proposals on frequently. They don't have four or five this year and four or five last year. What is not ordinary business with regard to the products and entity sales? You know, I think that you were asking for a line. I think when you're talking about a retailer. Yeah, I guess pretty much throughout I've been asking for a line. And I think to follow up on your question to my friend on the other side, the test I would propose is that the court would say we're talking about a proposal that indisputably would affect either directly or indirectly the products that a company would sell. That clearly falls within the ordinary business language. If there's a significant policy issue that is somehow implicated or folded into that, if the proposal itself goes beyond the significant policy issue and would affect ordinary business operations that are not encompassed, so, for example, go beyond gun sales, then the significant policy exception does not apply. The Grimes case I mentioned from the D.C. Circuit is a good example of that. And so I think here we have this long history of how the SEC has looked at these issues. Counsel relied on the 2009 SEC legal bulletin. It says the opposite of what Trinity says. It says just because a board is assessing risk, that doesn't end the story. So you look at the subject matter. Here it's the sale of products, that's ordinary business, and it should be excludable. Thank you. Quick question on timing. When do you need at least a bottom line decision from our court? We respectfully request a bottom line decision by April 15th. We have to go to the printer on the 16th. And let me just say we really appreciate how the court has expedited this and heard us on such a quick schedule. I would ask that you get together with Mr. Friedlander and have a transcript prepared of this oral argument on an expedited basis and split the cost if you would. We'd be happy to do so. And I want to thank both of you for very well presented arguments in your briefs and at oral argument. It's truly a privilege having you both here. Thank you very much. Thank you. A privilege to be here.